UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| SUSAN BYRNE,<br><br>        Plaintiff,<br><br>    v.<br><br>HEARTLAND EMPLOYMENT SERVICES, LLC; and HCR MANORCARE, INC.,<br><br>        Defendants. | Case No. 22-cv-01581-BLF<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW RE ARBITRATION AGREEMENT; AND ORDER GRANTING DEFENDANTS' MOTION TO COMPEL ARBITRATION AND STAY ACTION**<br><br>[Re: ECF 16] |

Defendants Heartland Employment Services, LLC ("Heartland") and HCR ManorCare, Inc. ("HCR ManorCare") have filed a Motion to Compel Arbitration and Stay Action Pending Arbitration, which is opposed by Plaintiff Susan Byrne ("Byrne"). *See* Mot., ECF 16; Opp., ECF 21. On August 18, 2022, the Court heard oral argument on the motion, and on November 2, 2022, the Court conducted an evidentiary hearing at which the parties presented live witness testimony and documentary evidence. *See* Minute Entry, ECF 38; Minute Entry, ECF 48.

For the reasons discussed below, Defendants' Motion to Compel Arbitration and Stay Action Pending Arbitration is GRANTED.

**I.     INTRODUCTION**

Byrne filed this suit in the Monterey County Superior Court, asserting discrimination, wrongful termination, and other state law claims against her former employer, Heartland, and its indirect parent company, HCR ManorCare. *See* Not. of Removal Ex. A ("Compl."), ECF 1. Byrne alleges that she worked for Heartland, a provider of home healthcare and related services, for eighteen years before she was terminated at the age of seventy-two. *See id*. ¶¶ 5-7. She asserts

claims for: (1) age discrimination under California's Fair Employment and Housing Act ("FEHA"); (2) wrongful termination in violation of public policy; (3) failure to prevent discrimination under FEHA; (4) breach of implied contract; (5) breach of implied covenant of good faith and fair dealing; (6) failure to timely provide wage statements and personnel records; and (7) declaratory relief. *See id.* ¶¶ 16-64.

Defendants answered and then removed the suit to federal district court on the basis of diversity of citizenship. *See* Not. of Removal & Ex. G. After removal, Defendants filed the current motion to compel arbitration, asserting that Byrne's claims fall within the scope of an arbitration agreement that she signed while employed by Heartland. *See* Mot., ECF 16. Defendants claim that Byrne electronically accessed and signed the arbitration agreement in 2016 using Heartland's online training portal. *See id.* Byrne filed opposition to the motion, denying that she electronically signed the arbitration agreement and suggesting that some other Heartland employee forged her electronic signature. *See* Opp., ECF 21. Byrne did not oppose the motion to compel on any other ground. *See id.* In reply, Defendants urged the Court to find the existence of a binding arbitration agreement notwithstanding Byrne's assertion that she did not sign the agreement. *See* Reply, ECF 32. In the alternative, Defendants requested a bench trial on contract formation pursuant to 9 U.S.C. § 4, a provision of the Federal Arbitration Act. *See id.* at 5.

The Court held a motion hearing via Zoom on August 18, 2022, at which counsel presented oral argument on the motion to compel. *See* Minute Entry, ECF 38. At the close of the hearing, the Court advised that it could not resolve the issue of contract formation on the record then before it. The Court therefore granted Defendants' request for a bench trial pursuant to 9 U.S.C. § 4, setting the matter for an in-person evidentiary hearing. *See* Order, ECF 40.

A three-hour bench trial/evidentiary hearing was held on November 2, 2022. *See* Minute Entry, ECF 48. The Court heard testimony from four witnesses: Plaintiff Susan Byrne; Jessica Gralak, Defendant Heartland's Learning Management System Administrator; Bob Moser, Defendant Heartland's Director of IT; and Mark Martins, Plaintiff Byrne's expert in the field of digital data. The Court also admitted a number of exhibits into evidence at the request of the parties.

## II. LEGAL STANDARD

Under the Federal Arbitration Act ("FAA"), "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition . . . for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4. "If the making of the arbitration agreement . . . be in issue, the court shall proceed summarily to the trial thereof." *Id*. "To implement this language, once a district court concludes that there are genuine disputes of material fact as to whether the parties formed an arbitration agreement, the court must proceed without delay to a trial on arbitrability and hold any motion to compel arbitration in abeyance until the factual issues have been resolved." *Hansen v. LMB Mortg. Servs., Inc.*, 1 F.4th 667, 672 (9th Cir. 2021).

"If no jury trial be demanded by the party alleged to be in default . . . the court shall hear and determine such issue." 9 U.S.C. § 4. "But if a jury trial is demanded, 'the court shall make an order referring the issue or issues to a jury in the manner provided by the Federal Rules of Civil Procedure, or may specially call a jury for that purpose.'" *Hansen*, 1 F.4th at 670 (quoting 9 U.S.C. § 4).

Where, as here, the party opposing arbitration does not demand a jury trial on arbitrability, the court proceeds with a bench trial under Federal Rule of Civil Procedure 52. *See Quiroz v. ADS-Myers, Inc.*, No. 20-CV-01755-JD, 2021 WL 4453579, at *1 (N.D. Cal. Sept. 29, 2021). "In an action tried on the facts without a jury . . . the court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a). "One purpose behind Rule 52(a) is to aid the appellate court's understanding of the bases of the trial court's decision." *Simeonoff v. Hener*, 249 F.3d 883, 891 (9th Cir. 2001) (internal citations omitted). The appellate court reviews the district court's factual findings for clear error, while the validity and scope of the arbitration agreement are reviewed de novo. *See Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1267 (9th Cir. 2006).

The district court is not required to make findings on each and every fact presented at trial. *See Simeonoff*, 249 F.3d at 891. However, the court must resolve conflicting testimony on relevant issues. *Zivkovic v. Southern California Edison*, Co., 302 F.3d 1080, 1090 (9th Cir. 2002).

3

## III. FINDINGS OF FACT

### A. Byrne's Employment with Heartland

1. Byrne was employed by Heartland for approximately eighteen years, from August 2002 to June 2020. Evidentiary Hearing Transcript ("Hrg. Tr.") (Byrne) 28:5-6, ECF 49.

2. Byrne logged into her computer at the beginning of each workday using a username and a complex password consisting of six characters including a combination of letters, numbers, and special characters ("Complex Password"). Hrg. Tr. 9:8-15 (Byrne); 109:11-110:14 (Moser).

3. A single-sign-on ("SSO") function enables employees, once logged in with their complex password, to navigate to the company home page, use the company's intranet, and click on links and applications. Hrg. Tr. 109:16-110:14 (Moser). The SSO service automatically logs employees into those applications. *Id*.

4. Because Byrne had access to confidential information regarding company personnel, she locked her computer whenever she walked away and she had to use her Complex Password to unlock her computer when she returned. Hrg. Tr. 20:15-21:2 (Byrne).

5. Byrne set her own Complex Password. Hrg. Tr. 109:25-110:5 (Moser).

6. Byrne could change her Complex Password at any time and she was required to change it every 90 days. Hrg. Tr. 10:23-11:12 (Byrne).

7. Byrne never shared her Complex Password with anyone else. Hrg. Tr. 16:5-14 (Byrne).

8. No one else at the company could have determined Byrne's Complex Password from her personnel file. Hrg. Tr. 110:8-10 (Moser).

9. One of the applications that employees can access through SSO after entering their Complex Password is Heartland's online training portal, HCR ManorCare University. Hrg. Tr. 109:12-111:22, 113:15-114:6 (Moser). Heartland's Learning Management System Administrator, Jessica Gralak, characterized HCR ManorCare University as "an online learning management system that provides training to all of the employees throughout the country." Hrg. Tr. 63:2-6 (Gralak). HCR ManorCare University is used for completion of paperwork for new hires and other materials such as the arbitration agreement at issue in this case. Hrg. Tr. 13:3-11 (Byrne).

10. The parties offered conflicting testimony as to whether employees could access HCR ManorCare University through SSO in 2016, which the Court resolves as follows. Heartland's Director of IT, Bob Moser, testified that employees could access HCR ManorCare University through SSO in 2016. Hrg. Tr. 109:12-111:22, 113:15-114:6 (Moser). Byrne testified that she did not "believe" HCR ManorCare University could be accessed using SSO in 2016, and that she "believed" SSO access to HCR ManorCare University was not available until 2018 Hrg. Tr. 9:18-10:5, 12:23-25 (Byrne). However, Byrne admitted that she was "not sure" whether HCR ManorCare University could be accessed using SSO in 2016. Hrg. Tr. 15:16-20 (Byrne). Given Moser's role at Heartland, the unequivocal nature of his testimony, and Byrne's lack of clear recollection, the Court credits Moser's testimony that HCR ManorCare University could be accessed through SSO, after logon using a Complex Password, in 2016. The Court does not credit Byrne's testimony on that point for the same reasons.

11. Employees also can access HCR ManorCare University a second way, using a less complex and more standardized password comprising the employee's first initial, the first four letters of the employee's surname, the employee number, and the last five digits of the employee's social security number ("Standardized Password"). Hrg. Tr. 10:13-21 (Byrne), 94:4-14 (Moser), 113:15-17 (Moser).

12. Byrne regularly accessed HCR ManorCare University during her employment. Hrg. Tr. 63:9-21 (Gralak). Heartland's records show that Byrne regularly used her Complex Password to access HCR ManorCare University. *Id*. 93:7-25 (Gralak).

**B.     Arbitration Agreement**

13. In 2016, Heartland rolled out a Mutual Agreement to Arbitrate Claims ("Arbitration Agreement") to employees through HCR ManorCare University. Hrg. Tr. 13:1-11 (Byrne). The roll out for California employees was in September 2016. *See id.* 64:2-6 (Gralak).

14. Defendants offered a copy of the Arbitration Agreement at the evidentiary hearing, and it was admitted without objection as Defendants' Exhibit 104. Hrg. Tr. 75:16-22; Defs.' Ex. 104 (Arbitration Agreement). As relevant to the present dispute, the four-page Arbitration Agreement provides as follows:

5

**MUTUAL AGREEMENT TO ARBITRATE CLAIMS**

This Mutual Agreement to Arbitrate Claims ("Agreement") is between you ("you" or "Employee") and Heartland Employment Services, L.L.C. ("EMPLOYER"). Any reference to EMPLOYER also includes its parent companies, subsidiaries, divisions, related companies, affiliates, and all successors and assigns of any of them. The Federal Arbitration Act (9 U.S.C. § 1 et seq.) ("FAA") governs this Agreement, which evidences a transaction involving commerce. **UNLESS YOU CHOOSE TO OPT OUT OF THE AGREEMENT IN ACCORDANCE WITH SECTION 8 BELOW, YOU AND THE COMPANY MUTUALLY AGREE THAT ALL DISPUTES COVERED BY THIS AGREEMENT SHALL BE DECIDED BY AN ARBITRATOR THROUGH ARBITRATION AND NOT BY WAY OF COURT, JURY TRIAL, OR ANY OTHER ADJUDICATORY PROCEEDING**.

1. **Covered Claims/Disputes**. Except as otherwise provided in this Agreement, this Agreement applies to any and all disputes, past, present or future, that may arise between Employee and EMPLOYER, including without limitation any dispute arising out of or related to Employee's application for employment, employment, and/or separation of employment with EMPLOYER, and this Agreement survives after the employment relationship terminates.
. . . .

Additionally, the Arbitrator, and not any court or agency, shall have the exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability, or formation of this Agreement.
. . . .

4. **Arbitrator Selection.** An arbitrator shall be selected by the mutual agreement of the parties. In the event the parties cannot agree to an arbitrator, they shall proceed to arbitration before a single arbitrator under the auspices of the AAA and the then current AAA Employment Arbitration Rules (the AAA Rules are available through EMPLOYER's Human Resources Department or the AAA's website (www.adr.org)), provided, however, that if there is a conflict between the AAA Rules and this Agreement, this Agreement shall govern.
. . . .

8. **Opting Out of the Agreement**. This Agreement is not a mandatory condition of employment. If Employee does not wish to be bound by this Agreement, he/she must send an email to the following email address: EmployeeArbitrationOptOut@hcr-manorcare.com, within fourteen (14) days of agreeing to the terms of this Agreement. In that email, Employee should provide his/her first and last name and state that he/she is opting out of this Agreement. If Employee timely opts out as provided in this section, Employee will not be subject to any adverse employment action as a consequence of that decision, and neither Employee nor EMPLOYER will be bound by this Agreement. Should Employee not opt out of this Agreement within fourteen (14) days, both Employee and EMPLOYER will be required to arbitrate all claims and disputes covered by this Agreement in accordance with its terms. Employee has the right to consult with counsel of his/her choice concerning this Agreement.

Defs.' Ex. 104 (Arbitration Agreement).

    15.    All new and current employees were required to complete a training on the

Arbitration Agreement through HCR ManorCare University and to electronically sign the Arbitration Agreement by December 31, 2016. Hrg. Tr. 64:15-25, 71:4-17 (Gralak).

16. The parties presented conflicting evidence as to whether employees were required to sign the Arbitration Agreement, which the Court resolves as follows. Heartland's Learning Management System Administrator, Jessica Gralak, testified that all employees were required to sign the Arbitration Agreement. Hrg. Tr. 64:15-25, 71:4-17 (Gralak). Defendants also offered screenshots of the training program that employees were required to complete on HCR ManorCare University, which were admitted without objection as Defendants' Exhibit 103. Hrg. Tr. 72:9-11; Ex. 103 (Training Screenshots). The training included a PowerPoint presentation stating that "all current and new employees will be required to sign Arbitration Agreements." Ex. 103 (Training Screenshots). Byrne testified that she did not remember that language from the PowerPoint she viewed. Hrg. Tr. 37:9-38:7 (Byrne). Byrne also testified that she never felt that she was required to sign the Arbitration Agreement. Hrg. Tr. 32:7-11 (Byrne). However, Gralak stated unequivocally that the PowerPoint submitted into evidence was the only PowerPoint ever created about the Arbitration Agreement. Hrg. Tr. 69:4-22 (Gralak).

The Court finds Gralak's testimony to be credible. The Court does not find Byrne's testimony to be credible. Byrne's testimony as a whole did not give the Court confidence in the accuracy of her memory. Moreover, the Court finds Byrne's testimony that employees were not required to sign the Arbitration Agreement is inconsistent with her testimony that Heartland's management believed it was so important that employees sign the Arbitration Agreement that they directed Byrne and others to forge employees' electronic signatures in HCR ManorCare University. *Compare* Hrg. Tr. 32:7-11 (Byrne) *with* Hrg. Tr. 57:11-58:6 (Byrne).

17. Although all employees were required to sign the Arbitration Agreement, they had fourteen days to opt out of the Arbitration Agreement after signing it. Hrg. Tr. 71:11-72:3 (Gralak); Arbitration Agreement ¶ 8.

C. **Byrne's Execution of Arbitration Agreement**

18. Byrne accessed HCR ManorCare University through SSO, using her Complex Password, on October 17, 2016, November 15, 2016, and November 17, 2016. Hrg. Tr. 86:16-21

1  (Gralak); Ex. 109 (Training Details and Transcript History Report).  Byrne completed the

2  arbitration training and electronically signed the Arbitration Agreement on November 17, 2016.

3  *Id*.

4    19. The parties presented conflicting evidence as to whether Byrne electronically

5  signed the Arbitration Agreement, which the Court resolves as follows.  Heartland's Learning

6  Management System Administrator, Jessica Gralak, testified at length about what an employee

7  completing the arbitration training sees on the computer screen.  Hrg. Tr. 65:3-85:18 (Gralak),

8  Exs. 101-108.  Gralak explained that the employee must scroll through a series of documents,

9  including the PowerPoint and the Arbitration Agreement, and click several buttons.  First, the

10  employee must click a button labeled "Mark Complete" to show the employee reviewed the

11  PowerPoint and the Arbitration Agreement.  Hrg. Tr. 75:11-14 (Gralak).  Next, the employee must

12  click a button labeled "Acknowledge" to get to the next screen.  Hrg. Tr. 77:5-7 (Gralak).  The

13  next screen shows a second button labeled "Acknowledge" side-by-side with a button labeled

14  "Cancel."  Hrg. Tr. 80:7-10 (Gralak).  The following language appears above the side-by-side

15  "Acknowledge" and "Cancel" buttons:

> By clicking the "Acknowledge" button below: a) you acknowledge that you have received and read the Mutual Agreement to Arbitrate Claims, b) you accept and agree to the terms of the Mutual Agreement to Arbitrate Claims; and c) you agree to using an electronic signature to accept and agree to the Mutual Agreement to Arbitrate Claims and that clicking on the "Acknowledge" button is as legally binding as an ink signature.

20  Hrg. Tr. 81:10-24, Ex. 107.  If the employee clicks "Acknowledge," the employee has signed the

21  Arbitration Agreement and the training is marked complete in HCR ManorCare University.  Hrg.

22  Tr. 83:1-9 (Gralak).  If the employee hits "Cancel," the screen disappears and the arbitration

23  training remains in "Pending Acknowledgment" status.  Hrg. Tr. 82:1-4 (Gralak).  The arbitration

24  training also remains in "Pending Acknowledgement" status if the employee exits without clicking

25  either "Acknowledge" or "Cancel."  Hrg. Tr. 82:10-25 (Gralak).

26    Gralak testified that the company's records show that Byrne went through the above

27  process and electronically signed the Arbitration Agreement.  Hrg. Tr. 86:16-87:1 (Gralak); Ex.

28  109 (Training Details and Transcript History Report).  The company's records show that the

8

arbitration training and signing of the Arbitration Agreement were done through SSO, after login with Byrne's Complex Password. Hrg. Tr. 93:3-94:3 (Gralak), Ex. 110. The Court finds Gralak's testimony, as supported by the records of Byrne's electronic access through SSO, to be credible.

Byrne testified that she logged into HCR ManorCare University to review the Arbitration Agreement using her Standardized Password, not her Complex Password. Hrg. Tr. 13:12-14:20 (Byrne). She denied electronically signing the Arbitration Agreement, although she seemed unsure when asked whether she could have signed and not remembered, responding "I don't think so." Hrg. Tr. 14:16-20 (Byrne). Byrne also suggested that someone else at the company forged her electronic signature on the Arbitration Agreement, and testified that she herself had forged the electronic signatures of other employees at the direction of her superiors. Hrg. Tr. 57:11-58:6 (Byrne). Byrne did not explain why she had not raised her asserted forgery of other's electronic signatures in her declaration filed in opposition to Defendants' motion to compel arbitration. Hrg. Tr. 60:9-11 (Byrne). She did not bring any witness to corroborate her contention, including her supervisor who Byrne claimed ordered her to do that. The supervisor, Cathy Tinnelly, had also offered a declaration in support of Byrne's claims that was silent on the point. Tinnelly Decl., ECF No. 21-3. Nor could Byrne explain how someone else could have obtained her Complex Password to log into the arbitration training and forge her electronic signature on the Arbitration Agreement. Hrg. Tr. 20:7-14 (Byrne). Given the inconsistency between Byrne's declaration and testimony, her failure to offer any explanation for the records of her access to HCR ManorCare University through SSO after login with her Complex Password, and her equivocal testimony regarding her memory of events, the Court finds Byrne's testimony not credible.

Byrne offered the testimony of Mark Martins, a purported expert in the field of digital data, who stated that he could not validate Heartland's records showing Byrne's execution of the Arbitration Agreement using SSO. Hrg. Tr. 121:13-122:7. However, on cross-examination, Martins admitted that he had not been provided with the information necessary to verify the information in Heartland's records. Hrg. Tr. 133:2-12 (Martins). Martins also admitted that he was not familiar with Cornerstone, the software program used to generate Heartland's records Hrg. Tr. 133:13-134:25 (Martins). Considering Martins' testimony as a whole, the Court finds

9

that it is not probative of any fact in this case, and in particular, it does not undermine Defendants' evidence that Byrne electronically signed the Arbitration Agreement through SSO after logging on with her Complex Password.

Further, Defendants' electronic evidence provides substantial support for the claim that Byrne executed the Arbitration Agreement. These records demonstrate that Byrne began the arbitration training on October 17, 2016, at 4:13:29 PM, and completed the arbitration training on November 15, 2016, at 3:26:46 PM. Ex 109; *see* Hrg. Tr. 88:3-19 (Gralak). They also indicate that she later executed the Arbitration Agreement on November 17, 2016, at 12:59:19 PM. *See id.* All three of these times match the electronic documentation of Byrne's login history, *see* Ex. 110., with the login on November 17, 2016, at 12:59:00PM, occurring nineteen seconds before the record of her execution. *Compare* Ex. 109 *with* Ex. 110. The Court considers this to be a reasonable amount of time to have elapsed for Byrne to log in and execute the agreement, given that she had already completed the training.

In summary, the Court finds Defendants' evidence that Byrne electronically signed the Arbitration Agreement to be credible, and Byrne's evidence to the contrary to be not credible.

20. Defendants' counsel asked Gralak about a glitch in the Cornerstone program that caused Heartland's internal record of Byrne's electronic signature to appear in Japanese characters. Hrg. Tr. 89:18-90:14. Gralak copied the Japanese characters into Google Translate and Google translated them as "Acknowledgement Is Completed." *Id*. Gralak also contacted Cornerstone, the vendor of the application, and Cornerstone fixed the glitch with the result that the Japanese characters were converted to English and now reflect that Byrne clicked the "Acknowledged" button. Hrg. Tr. 101:2-22 (Gralak).

21. Byrne also testified that she never saw any Japanese characters during her review of the Arbitration Agreement or the related online training. Hrg. Tr. 26:10-17, 27:2-4 (Byrne).

22. Byrne's counsel cross-examined Gralak vigorously about the Japanese characters, suggesting that the language glitch made the record of Byrne's execution of the Arbitration Agreement untrustworthy, and trying to get Gralak to admit that the company's records could be "jimmy-rigged." Hrg. Tr. 99:5-102:2 (Gralak). However, Gralak testified that the glitch was

Cornerstone's, that Cornerstone fixed the glitch and was responsible for the conversion to English, and that nobody at Heartland could have or did "jimmy-rig" the records. Hrg. Tr. 102:18-104:4 (Gralak). The Court finds credible Gralak's explanation of the glitch in the Cornerstone program, as well as her testimony that no one at Heartland altered the record of Byrne's arbitration training and execution of the Arbitration Agreement. The Court therefore finds that the Japanese characters do not call into question Defendants' strong evidence that Byrne herself electronically signed the Arbitration Agreement.

23.     Byrne did not opt out of the Arbitration Agreement within fourteen days after signing it. Hrg. Tr. 74:19-75:6 (Gralak).

## IV. CONCLUSIONS OF LAW

1.     The Federal Arbitration Act ("FAA") applies to arbitration agreements affecting interstate commerce. 9 U.S.C. §§ 1 *et seq*.

2.     "The FAA, 9 U.S.C. § 1 *et seq*., requires federal district courts to stay judicial proceedings and compel arbitration of claims covered by a written and enforceable arbitration agreement." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014).

3.     The Arbitration Agreement in this case is governed by the FAA. The Arbitration Agreement states expressly that it is governed by the FAA and that it affects interstate commerce.

4.     "The FAA limits the district court's role to determining whether a valid arbitration agreement exists, and whether the agreement encompasses the disputes at issue." *Nguyen*, 763 F.3d at 1175.

5.     The first of these issues is non-delegable and must be decided by the court. *See Ahlstrom v. DHI Mortg. Co.*, Ltd., L.P., 21 F.4th 631, 635 (9th Cir. 2021) ("[P]arties cannot delegate issues of formation to the arbitrator.").

6.     However, "[i]t is well-established that some 'gateway' issues pertaining to an arbitration agreement, such as issues of validity and arbitrability, can be delegated to an arbitrator by agreement." *Ahlstrom*, 21 F.4th at 634.

7.     This Court decides the non-delegable gateway issue of contract formation as follows. To determine "whether a valid arbitration agreement exists, federal courts apply ordinary

state-law principles that govern the formation of contracts." *Nguyen*, 763 F.3d at 1175 (internal quotation marks and citation omitted). "The internet has not fundamentally changed the requirement that mutual manifestation of assent, whether by written or spoken word or by conduct, is the touchstone of contract." *Dohrmann v. Intuit, Inc.*, 823 F. App'x 482, 483 (9th Cir. 2020) (internal quotation marks and citation omitted) (applying California law to arbitration agreement). Byrne electronically signed the Arbitration Agreement and thus under ordinary principles of California law, the Court concludes that she entered into the Arbitration Agreement.

8. The Arbitration Agreement delegates all other gateway issues to the arbitrator. Arbitration Agreement ¶ 1. Byrne does not argue to the contrary.

9. Accordingly, Defendants have established their right to compel arbitration of Byrne's claims. Byrne retains the right to challenge the enforceability and/or applicability of the Arbitration Agreement before the arbitrator.

## V. ORDER

(1) Defendants' Motion to Compel Arbitration and Stay Action Pending Arbitration is GRANTED.

(2) The parties SHALL commence arbitration proceedings within 90 days or file a joint status report explaining the failure to begin arbitration.

(3) This case is STAYED pending arbitration of Plaintiff Byrne's claims.

(4) The Clerk SHALL administratively close this case. This is an internal procedure that does not affect the substantive rights of the parties. The parties may request that the case be reopened, if appropriate, upon the completion of the arbitration proceedings.

(5) The parties SHALL file a Joint Status Report within thirty days after completion of arbitration.

(6) This order terminates ECF 16.

Dated:   December 14, 2022

BETH LABSON FREEMAN
United States District Judge